UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

NOT FOR PUBLICATION

DAVID S. RATTI,

        Plaintiff,

v.

SERVICE MANAGEMENT SYSTEMS, Inc.,

        Defendant.

Civ. Action No. 06-6034 (KSH)

**OPINION**

**Katharine S. Hayden, U.S.D.J.**

**I. INTRODUCTION**

Plaintiff David Ratti ("Ratti") has filed suit against his former employer, Service Management Systems, Inc. ("SMS"), asserting the following causes of action: (1) age discrimination under the New Jersey Law Against Discrimination ("NJLAD"); (2) disability discrimination under NJLAD; (3) negligent hiring and training; (4) breach of contract; (5) violations of the Family Medical Leave Act ("FMLA"); and (6) invasion of privacy. Currently before the Court is SMS's motion for summary judgment seeking a dismissal of the complaint.

**II. BACKGROUND**

On January 3, 1994, Ratti was hired as the manager of housekeeping at the Hudson Mall. Although he remained in that position for several years, Ratti was cited on several occasions for poor performance. In November of 1997, he received a Corrective Action Form ("CAF") identifying his performance issues, including neglecting to file paperwork, failing to supervise employees, and spending too much time away from his office. (Ex. I to Brown Cert.; Ratti Dep.

1

33:23-34:24.) In May of 2000, he received another CAF, this time citing failing to supervise, not covering weekend shifts, and refusing to wear the assigned uniform. (Ex. J to Brown Cert.; Ratti Dep. 36:13-37:19.) In April of 2001, he received another CAF for neglecting to post a work schedule for the employees. (Ex. K to Brown Cert.; Ratti Dep. 42:16-43:5.) And Ratti's January 2002 performance evaluation rated his work as unsatisfactory in the areas of responsibility, judgment, leadership and delegation, flexibility, adaptability, creativity, planning, organization, analytical ability, performance under pressure, and development of personnel. (Ex. L to Brown Cert.; Ratti Dep. 30:14-32:3.)

In July of 2005, SMS assumed responsibility for the maintenance and housekeeping at the mall from its predecessor, PREIT-RUBIN, Inc. ("PREIT"). As part of the transition from PREIT to SMS, the two companies entered into a Master Service Agreement ("MSA") specifying, among other things, which obligations SMS would assume and how SMS would go about hiring current PREIT employees. The MSA provides that:

> During the Transition Period, [SMS] shall interview for employment all of [PREIT]'s existing maintenance service supervisors who are directly employed by [PREIT] (unless [PREIT] intends to retain any such supervisor) in order for such employees to fill the same positions for [SMS] that such [PREIT] employees were filling for [PREIT] immediately prior to the Effective Date. [SMS] shall offer employment to any such supervisor that successfully passes drug testing and background checks, successfully completes such interview and otherwise appears to be competent…Notwithstanding the preceding, [SMS] shall not hire any such [PREIT] employee that fails to pass the drug testing and background checks required in this Agreement, and [SMS] may decline to hire any such employee for reasonable cause.

(Ex. A to Chatarpaul Certification 25:11.1.) Pursuant to the MSA, SMS retained Ratti when it took over the maintenance and housekeeping at the Hudson Mall. In a March 22, 2006 property inspection conducted by Ratti's immediate supervisor, Lorraine Harrison ("Harrison"), he performed poorly, receiving a composite quality rating of 52% and a composite administrative rating of 60%. (Ex. G to Brown Cert.)

2

On May 14, 2006, Ratti suffered a heart attack and was admitted to Christ Hospital for treatment. (Ex. B and Ex. C to Chatarpaul Cert.) As a result of his hospitalization, he was absent from work starting on May 15, 2006. He contends that his wife informed Harrison and Norma Lee Wepner ("Wepner"), an employee of Hudson Mall, on several occasions that he had suffered a heart attack. (Pls.' Opp'n Br. 10-12.) SMS asserts that "[d]espite his absence from work, Ratti never told his supervisor, Lorraine Harrison, that he had suffered from any kind of heart condition." (Def.'s Mot. Summ. J. Br. 7.)

On May 23, 2006, almost two weeks after Ratti's admission to the hospital, a Hudson Mall employee presented Harrison with a telephone bill to be paid by SMS. SMS provided Ratti with a cellular phone, and paid the bills on it. Harrison questioned whether the bill was for the telephone provided to Ratti by SMS and decided to search the desk in the management office. When she encountered a locked drawer, she had Wepner call Ratti to locate the key. While searching the drawer, Harrison found a paper bag containing a gun and ammunition. She reported the incident to her supervisor, Cecil Sloley ("Sloley"), who advised that she call the police. The police identified the gun as a pellet gun. Harrison contacted Ratti concerning the gun, which he admitted belonged to him. Section 522 of the SMS Handbook provides:

> Firearms, weapons, and other dangerous or hazardous devices or substances are prohibited from the premises of [SMS] without proper authorization…Anyone determined to be responsible for threats of (or actual) violence or other conduct that is in violation of these guidelines will be subject to prompt disciplinary action up to and including termination of employment.

(Ex. M to Brown Cert.) Ratti was fired that same day for violating Section 522. (Sloley Dep. 14:1-15; Ex. M to Brown Cert.)

### III. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) authorizes a court to enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

3

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The burden is on the party seeking summary judgment to prove that there are no genuine disputes of material fact. McCarthy v. Recordex Service, Inc., 80 F.3d 842, 847 (3d Cir. 1996). "Moreover, any inferences to be drawn must be viewed in the light most favorable to the party opposing summary judgment." Id. When the non-moving party's allegations conflict with those of the moving party, the non-moving party must receive the benefit of the doubt. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976). The Court's role, however, is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

## IV. DISCUSSION

In his opposition brief to SMS' motion for summary judgment, Ratti voluntarily withdraws his age discrimination and negligent hiring claims. (Pl.'s Opp'n Br. 5.) SMS moves for summary judgment on all of Ratti's claims, which include: (1) invasion of privacy; (2) breach of contract; (3) disability discrimination under NJLAD; and (4) violations of the FMLA. Because the Court sits in diversity here, it applies New Jersey law. In re Global Industrial Technologies, Inc., 333 B.R. 251, 256 (Bankr. W.D. Pa. 2005) (citing Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938)).

### 1. Invasion of Privacy

In Count Six, Ratti alleges that SMS, through its employees, intruded upon his seclusion when Harrison searched his desk. With respect to the tort of invasion of privacy, New Jersey courts have adopted the distinctions and definitions of the Second Restatement of Torts. Bisbee v. John C. Conover Agency, 186 N.J.Super 335, 339 (App. Div. 1982). The *Restatement (Second) of Torts*, Section 652B (1977) provides that an unreasonable intrusion occurs where a defendant "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or

concerns…if the intrusion would be highly offensive to a reasonable person." This determination turns on whether plaintiff had a reasonable expectation of privacy. White v. White, 344 N.J. Super. 211, 222 (Ch.Div. 2001). "A "reasonable person" cannot conclude that an intrusion is "highly offensive" when the actor intrudes into an area in which the victim has either a limited or no expectation of privacy." Id.

Ratti contends that he had a reasonable expectation of privacy from intrusion on his personal effects stored in the locked drawer and that he never gave his consent to search the drawer. SMS argues that Ratti had no objectively reasonable privacy right with respect to the drawer because the desk was located in an office at Hudson Mall that was unlocked during business hours and several supervisors used and had access to the desk. Ratti himself stated at his deposition that the desk contained SMS business and employee files, was used periodically by Lorraine Harrison and Cecil Sloley, and could be accessed by other SMS supervisors with their own keys. (Ratti Dep. 63:21-64:7, 66:5-69:9, 79:10-80.4, 80:8-81:14, 150:5-13; Wepner Dep. 28:14-24, 35:24-36:9.) These facts preclude a finding by a reasonable jury that Ratti had an objectively reasonable privacy right. The desk was located at his place of employment in an unlocked office, used by other employees, and contained his employer's documents. The Court grants summary judgment on the invasion of privacy claim and dismisses Count Six.

### 2. Breach of Contract

Ratti bases his breach of contract claim in Count Four on the SMS Employee Handbook and the Master Service Agreement between PREIT and SMS. He asserts that SMS when SMS fired him only 10 months after the transition, it violated the progressive discipline policy described in the employee handbook and the MSA provisions governing the hiring of former PREIT employees. "In New Jersey, as in most other states, absent an agreement to the contrary, the relationship between an employer and its employees is presumed to be for an indefinite period and terminable at

5

the will of either party - that is, except in certain limited instances where an employee's termination is statutorily proscribed or contrary to a clear mandate of public policy." Schlichtig v. Inacom Corp., 271 F. Supp. 2d 597, 603 (D.N.J. 2003). Nothing in the MSA or the SMS Employee Handbook overcomes this presumption.

New Jersey law does recognize a cause of action for breach of contract against employers who fail to honor the express or implied promises made in an employee manual or handbook. See Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284 (1985). See also Nicosia v. Wakefern Food Corporation, 136 N.J. 401 (1994). But employers can ensure that an employee handbook or manual cannot be construed as a binding contract. "All that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing and remains free to change wages and all other working conditions without having to consult anyone and without anyone's agreement; and that the employer continues to have the absolute power to fire anyone with or without good cause." Woolley, 99 N.J. at 309.

The first section of the SMS Employee Handbook, Section 101, consists of a prominent and unambiguous disclaimer that tracks the language suggested in Woolley:

> Employment with [SMS] is voluntarily entered into, and the employee is free to resign at will at any time, with or without cause. Similarly, [SMS] may terminate the employment relationship at will at any time, with or without notice or cause, so long as there is no violation of applicable federal or state law.
>
> Policies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between [SMS] and any of its employees.

(Ex. M to Brown Cert. § 101.) Section 101 appears on a page by itself and is the first page of policy provisions in the manual. Section 201 of the handbook also states that "the right to terminate the employment relationship at will at any time is retained by both the employee and [SMS]." (Ex. M to Brown Cert. § 201.) And section 405 of the handbook states SMS has the "right to terminate

6

employment at will, with or without cause, at any time." (Ex. M to Brown Cert. § 405.) Courts have consistently found similar disclaimers sufficient. See Mardini v. Viking Freight, Inc., 92 F. Supp. 2d 378, 383 (D.N.J. 1999) (Bissell, J.) (dismissing complaint where handbook disclaimer was "set out on a separate page on the first page of the text of the manual"). See also Theodossiou v. Commerce Bank, N.A., No. 06-4137, 2007 U.S. Dist. LEXIS 26029, *7-9 (D.N.J. Apr. 5, 2007) (Irenas, J.) (disclaimer that was a full page near the front of the handbook). Because the SMS Employee Handbook contains a disclaimer section set off on its own page, and at the beginning of the policy sections, that clearly and unambiguously states that the handbook does not constitute a binding contract, Ratti cannot make out a viable breach of contract claim with the handbook as his foundation.

Even if the Court deems the progressive discipline provisions of the handbook binding, Ratti's breach of contract claim fails. "[W]here an entire manual has been distributed to a workforce, that manual as a whole, not just a section of the manual, is relevant to the determination of whether it creates an implied contract of employment." Nicosia, 136 N.J. at 410-411. Ratti is not free to pick and choose which provisions of the handbook bind SMS, and duck the section of the handbook containing the weapons policy explicitly stating that an employee who "is in violation of these guidelines will be subject to prompt disciplinary action up to and including termination of employment." The handbook specifically authorizes the type of termination carried out here: a gun was found in Ratti's desk, he verified that it belonged to him, and his employment was terminated.

Ratti's reliance on the MSA as the source of a breach of contract claim is similarly misplaced. He contends, construing the MSA as a term employment contract between SMS and former PREIT employees, that the MSA restrains SMS from terminating former PREIT employees absent reasonable cause. While the MSA does outline the criteria and manner in which former PREIT employees could become SMS employees, this interpretation strains the bounds of reason. Ratti has

not identified, and the Court's review of the record did not find, a provision in the MSA that guarantees, provides for, or even discusses the length of employment for former PREIT employees. The provisions cited by Ratti, most notably the "reasonable cause" language, apply explicitly to hiring during the transition period and do not even obligate SMS to hire former PREIT employees. Under the MSA, SMS retained the discretion to decline hiring former PREIT supervisors who did not successfully complete an interview with SMS, did not pass a drug test or background check, or for reasonable cause. New Jersey law presumes that, absent an agreement to the contrary, an employment relationship is at-will. Nothing in the MSA transforms it into the guarantee of term employment Ratti claims it is.

Because the employee handbook and the MSA created no enforceable rights as to Ratti's term of employment, he cannot proceed on a breach of contract theory as a matter of law. Summary judgment is granted on this claim and Count Four of the complaint dismissed.

### 3. Disability Discrimination Under NJLAD

In Count One, Ratti contends that he suffered a heart attack on May 14, 2006, that SMS fired him to avoid allowing him the time off needed for his recuperation, and that the pellet gun incident was mere pretext. "To establish a *prima facie* case of discrimination under the NJLAD, a plaintiff must demonstrate: (1) that he was handicapped within the meaning of the law; (2) that he had been performing his job at a level that met his employer's legitimate expectations; (3) that he had been fired; and (4) that the employer sought another to perform the same work after he had been removed from the position." Leshner v. McCollister's Transp. Sys., 113 F. Supp. 2d 689, 691-692 (D.N.J. 2000) (citing Maher v. New Jersey Transit Rail Operations, Inc., 125 N.J. 455 (1991)). If an employee establishes a *prima facie* case of discrimination, the burden shifts to the employer to advance a legitimate, nondiscriminatory reason for the adverse employment decision. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Once the employer provides a legitimate reason

for the adverse employment action, the burden shifts back to the employee to raise an issue of fact regarding whether the employer's proffered explanation is pretextual. Jones v. School Dist., 198 F.3d 403, 410 (3d Cir.1999) (internal citations omitted). Summary judgment is appropriate where the plaintiff fails to establish his *prima facie* case because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. Watkins v. Nabisco Biscuit Co., 224 F. Supp. 2d 852, 860 (D.N.J. 2002) (citing Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992)).

      SMS contends that Ratti has not established the second element of his *prima facie* case, in that he failed to posit evidence demonstrating that he had been performing his job at a level that met SMS's legitimate expectations. The record is replete with support for this assertion. Ratti continuously received poor performance evaluations throughout his employment as a supervisor for PREIT. (Exs. I-L to Brown Cert.; Ratti Dep. 30:14-32:3, 33:23-34-:24, 36:13-37:19, 42:16-43:5.) Most importantly, on March 22, 2006, just two months before he was fired from employment with SMS, Ratti received a poor evaluation during a regional property review of Hudson Mall. His supervisor, Lorraine Harrison, summed up his performance as follows:

> This is your first Property review as you can see you did not score well. I want you to look at the areas that are not up to standards and correct them. Most of the areas are repeat items from several of my visits. The interior of the mall showed well, better policing and power washing is…needed on the exterior. The administrative part of the job is what is killing you, I have gone over the requirements with you and its [sic] still not happening. I will give you thirty days to correct this should there be no improvement disciplinary actions will follow.

Ratti failed to produce any evidence, such as demonstrating that his work performance had improved since that time or that his poor evaluations could be explained by some bias or other motivation, to contravene the weight of the record. Indeed, Ratti admitted during his deposition that he had been given opportunities to respond directly to or comment on his poor performance evaluations and had not done so. (Ratti Dep. 32:7-33:5, 43:14-44:1.) The facts taken at face value,

9

never mind in the best light for Ratti, establish that he was terminated while he was in the hospital recovering from heart failure.But this should not cloud what actually happened here — SMS fired a consistently underperforming employee who brought a dangerous weapon to work in direct violation of company policies.

Although the Court need not reach the other steps in the employment discrimination framework after having found that Ratti has not met his initial burden, his claim of pretext warrants discussion.  If Ratti had established his *prima facie* case, the burden would then shift to SMS to advance a legitimate, nondiscriminatory reason for terminating his employment.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  SMS argues that it has met its burden, in that Ratti was fired for keeping a pellet gun and ammunition in his desk in violation of SMS policies outlined in the employee handbook.  And although he explained that he used the gun to shoot rats at the mall, Ratti admitted in his deposition that he knew the gun could be used to cause bodily harm to human beings.  (Ratti Dep. 149:13-150:13.)  Moreover, the language in the employee manual explicitly states that possession of a weapon could result in prompt disciplinary action up to and including termination of employment.  SMS has met its burden.

Once the employer has met its burden, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons.

10

Id. at 765 (citations and quotations omitted).  Ratti has also not met this burden.  It is undisputed that the gun was found in his desk on the day he was fired, and he admitted that the gun belonged to him.  (Ratti Dep. 156:14-156:17.)  Critical to the required legal analysis, Ratti has failed to posit any evidence of discriminatory animus.  He identifies no statements by management from which to infer animus or cites other situation where employees were not terminated for the same or similar violations.

The timing of the termination may not be pretty, but there is no evidence that the employer was acting malevolently or with discriminatory intent when the gun was discovered.  Its discovery set in motion a termination decision that Ratti has not been able to impugn because it is consistent with an announced company policy.  The Court grants summary judgment as to the disability discrimination claim in Count One.

**4. Violations of the FMLA**

Ratti, relying on the same facts grounding his disability claim, contends that SMS fired him because he requested FMLA benefits to recover from his heart attack.  "The FMLA requires only unpaid leave, 29 U.S.C. § 2612(a)(1) [29 USCS § 2612(a)(1)], and applies only to employees who have worked for the employer for at least one year and provided 1,250 hours of service within the last 12 months, § 2611(2)(A)."  Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 739 (2003).  At the time he was fired, Ratti had been an employee of SMS for only 11 months and was therefore not eligible for FMLA benefits.  Furthermore, he could not recall at his deposition whether he was present when his wife requested FMLA forms from SMS (Ratti Dep. 137:2-137:18) or whether he had ever actually received FMLA forms (Ratti Dep. 139:3-139:4).  Even if the Court, as Ratti urges, were to interpret the MSA as having transferred FMLA eligibility for PREIT employees to SMS and accepts in the face of Ratti's own deposition testimony to the contrary that he in fact applied for FMLA benefits, he still has no recourse under the FMLA because his termination was legitimate.  The

11

Court has already determined that Ratti did not make a showing sufficient to survive summary judgment on the issue of whether he was fired unlawfully. He has not presented evidence that his termination had anything to do with his heart attack and similarly cannot base an FMLA claim on this insufficient factual showing. The Court grants summary judgment on Count Five.

## V. CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is **granted** and the complaint is dismissed. An appropriate order will be entered.


Dated: 8/25/08                                    /s/Katharine S. Hayden

                                                                     Katharine S. Hayden, U.S.D.J.